# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:23CR02 |
| vs. | FINDINGS AND RECOMMENDATION |
| EDUARDO GONZALEZ-MORENO, | |
| Defendant. | |

This matter is before the Court on the Motion to Suppress Evidence and Request for Evidentiary Hearing(s) for the Motion to Suppress and under *Franks v. Delaware* (Filing No. 18) filed by Defendant, Eduardo Gonzalez-Moreno. Defendant moves to suppress evidence and statements obtained from an encounter with law enforcement at a bus station, including evidence seized from his suitcase pursuant to a warrant. Defendant contends the seizure of his person and luggage violated his Fourth Amendment rights; the subsequently procured warrant was based upon those Fourth Amendment violations; the warrant was so lacking in probable cause that the *Leon* good faith exception does not apply; and requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) because the warrant affidavit contained material omissions or false statements.

Defendant filed a brief (Filing No. 19) in support of the motion. The government filed a brief (Filing No. 27) in opposition. The Court held pre-hearing status conferences with counsel on April 21 and 24, 2023, after which Defendant filed a supplemental brief (Filing No. 32) and the government filed a supplemental brief (Filing No. 33). The Court held an evidentiary hearing on the motion on May 22, 2023.[1] Defendant was present with his attorney, Richard H. McWilliams. The government was represented by Special Assistant United States Attorney, Joseph P. Meyer. Testifying at the hearing were: Nebraska State Patrol Investigator Nicholas Jaworski (TFO Jaworski); Drug Enforcement Administration (DEA) Special Agent Christian Iten (SA Iten); Douglas County Sheriff's Office Deputy Andrew Woodward (Deputy Woodward); and Nebraska State Patrol Officer Nicholas Bonney (TFO Bonney). The Court received into evidence, without objection, the government's exhibits:

Exhibit No. 1 - Body Worn Camera (BWC) footage from TFO Jaworski

---

[1] The hearing was set for the purpose of adducing evidence regarding the motion to suppress; the Court did not make a finding that Defendant had made a substantial preliminary showing necessary for a *Franks* hearing. However, the Court recognized the evidence for both issues may overlap, and thus permitted Defendant latitude in adducing testimony and evidence. (TR. 15-17).

Exhibit No. 2 - BWC footage from TFO Bonney
Exhibit No. 3 - BWC footage from TFO Bonney
Exhibit No. 4 - BWC footage from Deputy Woodward
Exhibit No. 5 - Photograph of Luggage Tag
Exhibit No. 6 - Photograph of Tape in Backpack
Exhibit No. 7 - Photograph of Tape on Suitcase
Exhibit No. 8 - Search Warrant Affidavit/Application
Exhibit No. 9 - Police Service Dog Certificate
Exhibit No. 10 - BWC footage from TFO Bonney
Exhibit No. 11 - Canine Records and Reports
Exhibit No. 12 - Canine Records and Reports

The Court also received into evidence, without objection, Defendant's exhibits:

Exhibit No. 101 - Photographs of Greyhound Under Bus Baggage Ticket (2 pages)
Exhibit No. 102 - Photographs of Defendant's wallet contents (3 pages)
Exhibit No. 103 - Screenshot from TFO Bonney BWC
Exhibit No. 104 - Screenshot from BWC of Hallway to Restroom
Exhibit No. 105 - Aerial View of Bus Station
Exhibit No. 106 - Photograph of West Exterior of Bus Station
Exhibit No. 107 - Photograph of West Exterior of Bus Station
Exhibit No. 108 - Screenshot from BWC of West Exterior of Bus Station
Exhibit No. 109 - Canine Performance Training Documents
Exhibit No. 110 - Primary Arrest Report
Exhibit No. 111 - Warrant Affidavit/Application

A transcript (TR.) of the hearing was prepared and filed on June 16, 2023. (Filing No. 39).

The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied in its entirety.

## BACKGROUND

In the early morning hours on November 3, 2022, members of a DEA Criminal Interdiction Unit task force, including TFO Jaworski,[2] SA Iten,[3] and TFO Bonney,[4] were conducting interdiction

---

[2] TFO Jaworski has been a trooper with the Nebraska State Patrol for over 22-years, has been an investigator assigned to a DEA Criminal Interdiction Unit task force for approximately 5 years, and has received extensive training in drug interdiction. (TR. 18-19).

[3] SA Iten has been a special agent with the DEA for three years, and at the time of the instant events, he was assigned to DEA Task Force Group Two, Commercial Interdiction Unit, working in commercial transportation and commercial sort facilities to interdict narcotics traffickers. (TR. 80).

[4] TFO Bonney has been employed with the Nebraska State Patrol for eleven and a half years and is assigned to DEA Task Force Group Two. TFO Bonney is also a canine handler. (TR. 146-147).

at the Trailways Bus Station in Omaha, Nebraska. TFO Jaworski and TFO Bonney were dressed in plain clothes, were armed with their concealed service weapons, did not have visible identification that they were law enforcement officers, and were wearing baseball caps containing body worn cameras. (TR. 20-22, 153-154). SA Iten was similarly dressed in plain clothes, was armed with a concealed weapon, did not have visible identification that he was law enforcement, but was not equipped with a body worn camera. (TR. 86, 89).

At approximately 5:30 a.m., Defendant arrived at the Omaha bus station on the bus that originates in Denver, and continues to Chicago. (TR. 20-21). All passengers are required to get off the bus for a driver change during this stop in Omaha, but they are not required to remove their luggage or stay in the terminal. (TR. 49). The length of the stop in Omaha varies, but it generally lasts between 20 to 30 minutes. (TR. 42, 98). It was during this stop that TFO Jaworski's attention was drawn to Defendant because he was "moving around" the bus terminal, he had "gone to the restroom a couple times," and he had several elastic luggage bands similar to ones used for luggage tags, but only had one luggage tag on his luggage. TFO Bonney and SA Iten had also observed Defendant's restroom trips. TFO Jaworski took note of Defendant's restroom trips because officers have found drugs "dumped" inside the Omaha bus station restroom before, and also knew drug traffickers are aware that "cops work at that Omaha station." Defendant was traveling with a satchel, a backpack, and a small carry-on size suitcase. (TR. 23-24, 50-51, 94).

TFO Jaworski first contacted Defendant as he walked out of the restroom and towards the lobby. TFO Jaworski approached Defendant, displayed his badge, and identified himself as a police officer. TFO Jaworski told Defendant he was not in any trouble and was not under arrest. Defendant indicated did not speak English, and TFO Jaworski does not speak Spanish, so TFO Jaworski utilized a Google Translate application ("the Google Translate app") on his phone to communicate with Defendant. (Ex. 1 at 0:30-0:55; TR. 24). TFO Jaworski used the Google Translate app's "conversation mode," which he explained translates his spoken English into Spanish text and also generates a voice that speaks the translated text. (TR. 25-26). Utilizing the Google Translate app, TFO Jaworski again advised Defendant that he was a police officer, that Defendant was not in trouble or under arrest, and asked Defendant if he understood. Defendant nodded his head in the affirmative and said "si." TFO Jaworski asked Defendant if he "had a second to talk," and Defendant nodded his head in the affirmative. (Ex. 1 at 0:55-1:18; TR. 26).

Using the Google Translate app, TFO Jaworski asked Defendant about his travel plans. TFO Jaworski understood Defendant was traveling from Los Angeles and was going to Raleigh, North

Carolina to visit a cousin, and his "home" is Mexico. TFO Jaworski asked Defendant how long he was going to stay in North Carolina; TFO Jaworski testified there was some slight confusion on this question because the Google Translate app stated Defendant's answer was a "few weeks, a few days"; TFO Jaworski clarified with Defendant as to whether he meant weeks or days, and Defendant replied said "dias," as in days. TFO Jaworski checked Defendant's bus ticket and noticed it was for one-way travel, and commented that it seemed like a long bus ride for a short visit in North Carolina. TFO Jaworski testified he believed Defendant comprehended his questions as translated by the Google Translate app, but sought the assistance of SA Iten, who speaks Spanish, for further conversation with Defendant. (Ex. 1 at 1:19-3:53; TR. 27-28). During this time, TFO Bonney stood approximately 10 to 12 feet away and was not part of their conversation. (TR. 154).

SA Iten testified he speaks Spanish. He took one year of Spanish in high school in 2001, and then studied French and Arabic in college. SA Iten resumed learning Spanish in 2013 when he was employed as an officer in Virginia. (TR. 81-82). SA Iten introduced himself to Defendant as a police officer and had a conversation with him in Spanish. SA Iten believed Defendant understood him and they had a dialogue. SA Iten testified that, when there were times that Defendant did not seem to understand or if SA Iten did not "possess the words at that moment," he would try to rephrase his statement or question. (TR. 86-88). SA Iten testified he acted as TFO Jaworski's translator, and asked about Defendant's travel plans and explained to Defendant what the officers were doing at the bus station. Defendant told SA Iten he was going to be in North Carolina for about a week, stated he had not been to North Carolina before, was going to stay with family, and was going to buy his return ticket after he got to North Carolina. SA Iten asked Defendant if he had any illegal drugs or items on him, and Defendant replied no, he was not carrying any narcotics. (Ex. 1 at 4:09-5:48; TR. 91).

About six minutes into the encounter, TFO Jaworski asked SA Iten to ask Defendant for consent to search his bags. SA Iten conversed with Defendant for approximately two minutes, during which SA Iten asked TFO Jaworski if he knew the word for "room." TFO Jaworski used the Google Translate app to translate "Would you want to do it in a private room out of the public?" SA Iten continued to speak to Defendant in Spanish to explain the request for a search of his bags, and Defendant declined. SA Iten then asked Defendant for consent for a dog to sniff his bags by using the word "perro" (Spanish for "dog") and "sentir" (French for "to smell") and touching his nose with his hands. Defendant nodded his head in the affirmative. (TR. 90-94, 104; Ex. 1 at 5:28-8:31).

Task force officers then led Defendant through a back door to the outside of the bus terminal. Defendant carried his three bags outside and placed them on the pavement along the exterior wall of

the west side of the bus terminal building. While Defendant was placing his luggage on the pavement, TFO Jaworski asked SA Iten, "Does he understand what's going on?" SA Iten spoke to Defendant in Spanish, and replied, "Yeah, he knows that the dog's coming." TFO Jaworski approached TFO Bonney to update him on the situation, and stated, "I don't know if he completely understands consent. [SA Iten] went through it a couple times and it sounds like he didn't want to allow a search of the bags, so we just went to this." (Ex. 1 at 8:31-10:25; TR. 31, 39-40).

Deputy Woodward was working at the bus station with his drug canine, Loki. Deputy Woodward has been a canine handler for 12 years, and has been with Loki for seven years. Loki is certified as a narcotics' indicating canine, which includes marijuana, methamphetamine, heroin, and cocaine, but not fentanyl. Deputy Woodward and Loki recertify every year. (TR. 108-112; Ex. 9). Deputy Woodward was asked to deploy Loki to sniff Defendant's three pieces of luggage placed outside of the bus station along the west wall. Deputy Woodward deployed Loki from the north to the south in order to "get Loki's nose into . . . the wind." Deputy Woodward testified Loki alerted to the suitcase and gave an indication to the backpack, but initially only told the TFOs about the backpack. (TR. 31-32, 117-119; Ex. 4 at 1:04-1:36; Ex. 1 at 10:53-11:00).

Deputy Woodward testified an alert is "an untrained behavior when the dog is in an odor of a narcotic." Deputy Woodward testified that Loki alerts by "becom[ing] nasally" and his "tail will start wagging, and you'll see him working in the area of where the odor is emanating from." Deputy Woodward testified an indication is "the final behavior when the dog is in an odor of one of the four odors that it is trained on." Loki's indication is to "take a deep breath" and either stand and stare, sit down and stare, or lay down and stare because he is a passive-indicating dog. Deputy Woodward testified there cannot be an indication without an alert, and an alert always precedes an indication. Deputy Woodward testified he initially only advised task force officers of Loki's indication to the backpack because in his view "the indication was more important than the alert was at that time." (TR. 114-115).

After Deputy Woodward advised of Loki's indication to the backpack, TFO Jaworski directed SA Iten to advise Defendant of his rights. SA Iten stated he did not have a rights advisory form in Spanish and asked TFO Jaworski to use the Google translate app. TFO Jaworski used the Google Translate app to tell Defendant he was "being detained for investigation," and asked Defendant if he understood. Defendant asked "porque?" TFO Jaworski replied, using the Google Translate app, "The police dog indicated to the odor of drugs coming from your bag." SA Iten needed to continue with the rights advisory, but since he had misplaced his DEA Spanish rights advisory

form, SA Iten replied he could "fake it" (i.e., make his "best effort") to advise Defendant of his rights in Spanish without reference to the form. SA Iten advised Defendant he did not have to say anything "at that time" or "now" ("ahora"); that if Defendant could not afford an attorney, the United States will pay for that attorney; and anything that they were talking about can be used against Defendant in court. (TR. 32, 36-37, 94-95, 98-99, 161). TFO Jaworski asked SA Iten to tell Defendant they were going to get a warrant and that he was going to miss his bus. SA Iten spoke to Defendant in Spanish and then conveyed Defendant's consent to search his backpack "real quick." (TR. 34, 96-97, 99-101; Ex. 1 at 11:00-14:27).

During the search of Defendant's backpack, officers found clothing and a roll of brown packing tape, but no contraband. (TR. 33; Ex. 6). TFO Jaworski asked SA Iten to ask Defendant what the tape was for. Defendant replied it was for a gift. TFO Jaworski asked where the gift was, and Defendant replied not with him or not here. (TR. 34; TR. 77). In TFO Jaworski's training and experience, he found the packing tape suspicious because "kilos" of illegal narcotics are occasionally wrapped with brown packing tape. (TR. 34). TFO Jaworski testified it was the type of brown packing tape that he would use on boxes, rather than Scotch or clear tape typically used for gifts. (TR. 77). TFO Jaworski asked SA Iten to clarify whether Defendant was going to let them "search all of them." TFO Bonney also spoke to Defendant using the Google Translate app and asked for consent to search the suitcase. TFO Bonney pointed to the suitcase to make it clear which bag he was asking to search. SA Iten conveyed Defendant's statement that he was not providing his consent to search the suitcase because the dog only found the smell on the backpack. (TR. 40-41, 157; Ex. 1 at 14:30-17:00).

TFO Jaworski noticed there was a piece of brown packing tape similar to the tape found in the backpack placed on the side of the suitcase, which he believed meant the backpack and suitcase belonged together. He also noticed the suitcase's luggage tag only had a destination and not a name, which he found suspicious because "if someone is transporting controlled substances or illegal items, whether it be weapons, whatever, they'll put limited information on the tag in the event that they're encountered with law enforcement, to kind of distance themselves and attempt to distance themselves from the bag." (TR. 35; Ex. 5; Ex. 7).

After the search of Defendant's backpack, task force officers discussed the next steps in light of Defendant's continued non-consent to a search of his suitcase, including obtaining a search warrant. TFO Bonney also asked Deputy Woodward if he wanted to move the luggage inside so that the wind would not affect Loki; Deputy Woodward testified he was "fine with the way the deployment went" and at that time advised task force officers that Loki had alerted to the suitcase in

6

addition to indicating to the backpack. Deputy Woodward did not deploy Loki a second time. (TR. 120-121; Ex. 1 at 17:00-19:30).

As Defendant had not consented to the search, TFO Jaworski decided to apply for a search warrant for Defendant's suitcase based on the information Defendant provided about his travel itinerary, the alert and indication on the backpack, the alert to the suitcase, the luggage tag not being completely filled out, and the brown packing tape found inside the backpack with corresponding tape on the suitcase. (TR. 37-38). Task force officers decided to detain Defendant pending procurement of the search warrant after learning he was not a U.S. Citizen and not a local resident. While officers were talking to Defendant outside the bus terminal, the bus driver was waiting to leave until the officers finished their conversation with Defendant to see if he would be allowed to reboard. TFO Jaworski confirmed Defendant would be detained pending procurement of a search warrant. The bus left the terminal and Defendant was handcuffed after approximately 22 minutes from the beginning of the encounter. (TR. 41-44, 71; Ex. 1 at 19:30-22:00). Defendant was kept handcuffed and seated in a back room of the bus station while TFO Jaworski sought the warrant. (TR. 38, 162). TFO Jaworski then went outside to his work truck parked on the street next to the bus station to type the search warrant affidavit. (TR. 44-45).

When TFO Jaworski was finished typing his affidavit, he went to the Douglas County courthouse and presented the search warrant affidavit and warrant to a Douglas County judge, who signed the warrant. (TR. 45; Ex. 8). The search warrant affidavit set forth the following information:

. . . On November 3, 2022, Your Affiant of the Nebraska State Patrol along with additional members of the Commercial Interdiction Unit, were conducting routine surveillance near the Bus Station at 1601 Jackson St. Omaha, NE.

Your Affiants had contact with a male subject later identified as Eduardo Moreno Gonzalez [Defendant]. DOB: [redacted]/99. Your Affiant made contact with Gonzalez, displayed his badge and identified himself as police officer. Your Affiant advised Gonzalez he was not under arrest or in trouble. Your Affiant asked Gonzalez if he had a second to talk. Gonzalez advised he did not speak English. Your Affiant utilized the [G]oogle translate app.

The Google app translated to Spanish and also spoke so Gonzalez could understand. Your Affiant confirmed Gonzalez understood. Your Affiant spoke with Gonzalez about his travel. Gonzalez stated he was going to Raleigh, North Carolina to visit family. Your affiant asked Gonzalez how long he was going to be in North Carolina. Gonzalez stated a few days to a few weeks. Your affiant asked if he had booked a return ticket yet. Gonzalez stated he has not. Your Affiant asked Gonzalez where he started his trip. Gonzalez stated in Las Angeles [sic] and later stated he was coming from Mexico. Your affiant is aware from training and experience that Las

7

Angeles [sic] is a source area for controlled substances. Your affiant was assisted by Special Agent Chris Iten who is more fluent in Spanish. Gonzalez stated this was his first trip to North Carolina. SA Iten explained to Gonzalez that he appeared nervous and had made multiple trips to the bathroom. SA Iten asked Gonzalez if he was transporting any weapons or drugs. Gonzalez stated he was not transporting anything illegal. SA Iten asked Gonzalez if he would consent to a search of his bags. Gonzalez stated he would not. SA Iten asked Gonzalez if he would allow a police K9 to sniff the bags. Gonzalez stated he would allow that. Gonzalez walked his bag outside the bus station and placed them on the ground.

Your affiant requested TFO Andrew Woodward and his narcotic detection canine "Loki" sniff the luggage. TFO Woodward of the Douglas County Sheriff's Office completed the sniff and advised there was an alert and indication to the odor of narcotics on the black backpack and an alert to the odor of narcotics from the black soft sided suitcase. Your Affiant is aware TFO Woodward and Loki were last certified in April of 2022 and are currently certified.

SA Iten advised Gonzalez of his rights in Spanish and explained the police k9 alert to the bag. Gonzalez stated he would allow for a search of the backpack. Your affiant conducted a search and noted clothes and a roll of packing tape in the bag. Your affiant is aware that tape is commonly used to wrap controlled substances. Gonzalez stated the tape was for a gift but he did not have the gift. Your affiant noted the suit case had small piece of the same tape attached to the outside of the suitcase. Your affiant also noted the luggage tag on the suitcase was not completely filled out and only stated Raleigh, NC with no name. Gonzalez would not allow investigators to search the suitcase only the backpack.

Based on training and experience and the alert by the police K9 your affiant believes that there is probable cause to believe and does believe that evidence involved with the distribution of controlled substances will be located in a black soft sided suitcase, Collex brand, a small black leather style over the should satchel with three zippers, a black suitcase, highland tactical brand. Belonging to Gonzalez.

(Exhibit 8).

A Douglas county judge signed the search warrant based upon the information set forth above. TFO Jaworski then returned to the bus station to serve and execute the warrant, approximately 70 minutes after he had left. In searching the suitcase, officers located two kilo bricks wrapped in brown packing tape later determined to be fentanyl. (TR. 45-46). The parties stipulated that Defendant was 23 years old at the time of this encounter. (TR. 17).

On January 18, 2023, the grand jury returned a one-count indictment against Defendant charging him with knowingly and intentionally possession with intent to distribute a mixture or

substance containing a detectable amount of Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1). (Filing No. 1).

Defendant has filed the instant motion to suppress the contents of the suitcase and his backpack, evidence taken from his person, and any statements he made to officers during his November 3, 2022, encounter with law enforcement. Defendant first argues the search warrant was fruit of his unlawful detention and unlawful seizure of his luggage at the bus station. Defendant asserts the original encounter with law enforcement was not consensual, but was instead a detention unsupported by reasonable suspicion. (Filing No. 19 at pp. 6-7). Defendant further asserts his consent to the dog sniff of his bags and his consent to the search of his backpack was invalid. (*Id.* at pp. 10-13). Defendant contends he was arguably under arrest when officers first led him from the terminal through the back office, but he certainly was under arrest once he was handcuffed and was caused to miss his connecting bus, without probable cause. Defendant argues that the search warrant for his suitcase was therefore invalid because it contained the information gathered from his unlawful seizure and the unlawful search of his backpack. (*Id.* at pp. 13-14). Defendant also argues the warrant was so lacking in probable cause that officers unreasonably relied upon it, such that the *Leon* good faith exception does not apply. Finally, Defendant asserts portions of the affidavit in support the warrant contained statements and omissions made knowingly or in reckless disregard for the truth. Specifically, Defendant asserts the affidavit describes events inaccurately and nonchronologically, and the affidavit "did not explain the legal/scientific distinctions between [a drug canine's] alert and full indication." (Filing No. 15-19).

## ANALYSIS

Defendant seeks suppression of evidence obtained pursuant to a search warrant, asserting the affidavit in support of the warrant included information obtained from a violation of his Fourth Amendment rights. "If an affidavit in support of a warrant contains information that was obtained in violation of the Fourth Amendment, the reviewing court must redact that information and evaluate whether the remainder establishes probable cause." *United States v. Brooks*, 22 F.4th 773, 778-79 (8th Cir.), *cert. denied*, 142 S. Ct. 2826 (2022) (citing *United States v. Karo*, 468 U.S. 705, 719 (1984) and *United States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008)).

### I.    Initial Encounter with Task Force Officers

Defendant first argues his initial encounter with TFO Jaworski was not consensual, but was instead a detention without reasonable suspicion because as "a stranger in a strange country," he did not feel free to decline TFO Jaworski's requests to speak to him, and was "boxed in" when SA Iten joined the conversation as a translator. (Filing No. 19 at pp. 6-7).

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002); see also *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage--provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201 (citing *Bostick*, 501 U.S. at 434-35). "To determine whether a police-citizen encounter is consensual or implicates Fourth Amendment protections," the court "must 'consider[ ] the totality of the circumstances' and 'the unique facts of each case.'" *United States v. Lillich*, 6 F.4th 869, 876 (8th Cir. 2021) (quoting *United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012)). Several factors are relevant to this analysis, including:

> [O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

*Id.* (quoting *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008)). Ultimately, "[t]he test for whether a person has been 'seized' within the meaning of the Fourth Amendment is an 'objective standard' that looks to whether a reasonable person would have believed that he was not free to leave." *United States v. Grant*, 696 F.3d 780, 784-85 (8th Cir. 2012) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)).

Here, considering all the surrounding circumstances, the undersigned magistrate judge finds the initial encounter between Defendant and law enforcement was consensual. Defendant had disembarked from his bus due to a regularly scheduled stop in Omaha and was walking around the public bus terminal. TFO Jaworski alone approached Defendant near the public restrooms of the terminal wearing plain clothes with his firearm concealed, displayed his badge, and identified himself as a police officer. TFO Jaworski told Defendant he was not in any trouble and was not under arrest. Defendant indicated he did not speak English, so TFO Jaworski utilized a translation app to

10

repeat in Spanish that he was a police officer, that Defendant was not in trouble or under arrest, and asked Defendant if he understood. Defendant nodded his head in the affirmative and said "si." TFO Jaworski used the Google Translate app to ask Defendant if he had a moment to speak, and Defendant nodded his head in the affirmative. TFO Jaworski examined Defendant's bus ticket and returned it. Jaworski's tone was conversational, he did not use any force or intimidation, did not display his weapon, and did not corner Defendant or otherwise restrict his movements.

After speaking to Defendant about his travel plans for less than three minutes using the Google Translate app, TFO Jaworski called SA Iten over to act as a Spanish translator. Similar to TFO Jaworski, SA Iten maintained a conversational tone, he did not use any force or intimidation, did not display his weapon, and did not corner Defendant or otherwise restrict his movements. TFO Jaworski's body camera footage does not support Defendant's assertion he was "boxed in," but instead reflects that TFO Jaworski and SA Iten positioned themselves in a way that Defendant could have walked forward into the bus terminal, and reflects SA Iten adjusted his position to move out of the way of other bus passengers walking nearby and around Defendant and the officers. Defendant did not attempt to leave, walk away, or otherwise distance himself from TFO Jaworski and SA Iten.

Defendant also asks the Court to consider his subjective state of mind because as a "stranger in a strange country," he did not feel free to decline TFO Jaworski's invitation to talk; however, the test for whether a person has been "seized" within the meaning of the Fourth Amendment is an "objective standard, to "ensure[] that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.[.]" *United States v. Grant*, 696 F.3d 780, 784-85 (8th Cir. 2012). And, after review of the evidence and under these circumstances, the undersigned magistrate judge finds nothing to suggest the initial encounter between the task force officers and Defendant was coercive or anything other than a consensual encounter, and a reasonable person in Defendant's position would have felt free to leave. See, e.g., *Drayton*, 536 U.S. at 204 (finding no detention when "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of [the bus] exits, no threat, no command, not even an authoritative tone of voice."); *United States v. Richardson*, 275 F. App'x 571, 572 (8th Cir. 2008) (finding initial encounter at bus depot was consensual where officers approached the defendant in a public place, told the defendant he was not under arrest and did not have to answer questions).

II.      **Defendant's Consent to the Canine Sniff**

"[A]n initially consensual encounter can ripen into a seizure requiring reasonable suspicion or probable cause." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988); see also *United States v. Green*, 52 F.3d 194, 197 (8th Cir. 1995) (a consensual encounter became an investigatory stop that required reasonable suspicion when, after the defendant declined a request to search her bag, the officer informed her that he would detain the luggage for a dog sniff). Additionally, "Police officers may briefly detain luggage for a dog-sniff search without violating the Fourth Amendment if the owner of the luggage consents . . . or if there is reasonable suspicion supported by articulable, objective facts that the luggage contains drugs." *United States v. Jones*, 990 F.2d 405, 407 (8th Cir. 1993). To assess whether an officer had reasonable suspicion based on specific, articulable facts, courts "look at the totality of the circumstances, allowing officers to draw on their experience and training." *United States v. Lawhorn*, 735 F.3d 817, 820 (8th Cir. 2013) (citing *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008)).

Here, during the consensual encounter, officers asked Defendant for consent to search his bags, and he declined. Officers then asked Defendant for consent for a dog to sniff his bags. During a consensual encounter, law enforcement may request consent to search an individual's luggage, provided the officers do not induce cooperation by coercive means. See *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) (request to search made during consensual encounter is permissible with or without reasonable suspicion). In this case, the undersigned magistrate judge finds Defendant's consent to the dog sniff was necessary to detain him and his luggage because, at the time such consent was requested, officers did not have reasonable suspicion that the luggage contained drugs.[5] See *Jones*, 990 F.2d at 407. When the officers asked Defendant for consent to the dog sniff, the only facts they had to support their suspicions of criminal activity were that Defendant went to the bathroom a couple of times and seemed nervous, he was from Mexico and had purchased a one way bus ticket for a cross-county trip beginning in Los Angeles to stay with relatives in Raleigh for a few days to a week, and he had several elastics on his luggage. These facts, standing alone, do not meet the threshold of reasonable suspicion under the Fourth Amendment. Therefore, the undersigned magistrate judge must determine whether Defendant's consent to the dog sniff was valid.

---

[5] The government acknowledges in its brief "the encounter was consensual up to the point when [Defendant] consented to the dog sniff," (Filing No. 27 at p. 19), and at the hearing took the position Defendant was not detained until after the drug canine alerted and indicated to his luggage. (TR. 179-180).

To establish voluntary consent, "the Government must demonstrate by a preponderance of the evidence that consent was 'the product of an essentially free and unconstrained choice.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 895 (8th Cir. 2020) (quoting *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004)). An individual voluntarily consents if, by his words and conduct, he causes a "reasonable person to believe" the individual "has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Cedano-Medina*, 366 F.3d at 684-85. Courts "analyze several factors in determining whether consent was given voluntarily, taking into account the totality of the circumstances." *Garcia-Garcia*, 957 F.3d at 896 (citing *United States v. Correa*, 641 F.3d 961, 966-67 (8th Cir. 2011). Those factors include the defendant's

> age, education, intelligence, sobriety, and experience with the law; and . . . context . . ., such as the length of . . . questioning, the substance of any discussion . . . preceding the consent, whether the defendant was free to leave . . ., and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*Id.* at 896-897 (quoting *Correa*, 641 F.3d at 966-67). "The factors should not be applied mechanically, and no single factor is dispositive or controlling." *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004) (citation omitted).

Additionally, consent cases "involving translated requests present a threshold question of comprehension." *Garcia-Garcia*, 957 F.3d at 892 (quoting *United States v. Gallardo*, 495 F.3d 982, 988 (8th Cir. 2007)). The Eighth Circuit has "previously suggested that a reasonable officer would not believe that a suspect consented where there is a clear lack of comprehension by the listener" because a "reasonable officer would only believe a suspect consented if he believed the suspect understood the request." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "In the context of an imperfect translation, [courts] look to indicators that would give a reasonable officer confidence that the suspect comprehended the request." *Id.* These indicators include

> whether the "context of the conversation" made the officer's meaning reasonably apparent . . .; whether the suspect responded in appropriate ways suggesting comprehension . . .; and whether the officer relied on a translation produced by a reliable source such as a translator . . . , or an approved foreign-language consent form[.]

*Id.* (internal citations omitted). No factor is dispositive, and reasonableness is instead analyzed based on the totality of the circumstances. *Id.* (citing *United States v. Drayton*, 536 U.S. 194 (2002)).

In this case, the undersigned magistrate judge will start with the threshold question of comprehension because, as SA Iten testified, he asked Defendant for consent the dog sniff by using

13

the Spanish word for dog, "perro," but used the French word for smell, "sentir," while touching his nose with his hands. And, although it is not a clear cut call, after review of the body camera footage and testimony at the hearing, the undersigned magistrate judge finds a reasonable officer would believe Defendant had comprehended SA Iten's imperfectly translated request and consented to the dog sniff.

From the outset, TFO Jaworski was able to have a simple conversation with Defendant with relative ease using the Google Translate app. After three minutes of basic conversation, TFO Jaworski asked SA Iten to act as a Spanish translator. SA Iten testified he first learned Spanish in high school, and has been using Spanish during his career in law enforcement since 2013. SA Iten spoke to Defendant in Spanish for several minutes, and Defendant and SA Iten largely appeared to understand one another. During his conversation with Defendant, SA Iten informed Defendant about what law enforcement was doing at the bus station and why they were talking to Defendant, and asked Defendant if he had anything illegal on him. Defendant replied he was not carrying narcotics. In this context, TFO Jaworski asked SA Iten for Defendant's consent to search his bags, and Defendant declined. SA Iten then made the request for the dog sniff by stating "perro" and touching his nose, and Defendant nodded his head. The fact that Defendant understood—and declined—the request for consent to search would suggest to a reasonable officer that Defendant also understood the follow-up request for the dog sniff, and that the purpose of these requests were to search for illegal items or drugs. Defendant's comprehension of the request for the dog sniff was further confirmed because, while Defendant was placing his luggage on the pavement outside, TFO Jaworski asked SA Iten, "Does he understand what's going on?" SA Iten again spoke to Defendant in Spanish, and replied, "Yeah, he knows that the dog's coming." As such, although SA Iten's Spanish translation may have been imperfect, in the context of their interaction and the surrounding circumstances, a reasonable officer would believe Defendant had understood the request for consent for the dog sniff.

It was also reasonable for officers to believe Defendant voluntarily consented to the request. Defendant was 23 years old at the time of the encounter, and did not appear to be under the influence of any substances. Using the Google Translate app or SA Iten speaking Spanish, officers had a conversation with Defendant during which they all appeared to understand one another. The request for consent to the dog sniff occurred just over eight minutes after TFO Jaworski first contacted Defendant during a consensual encounter. SA Iten had explained why officers were at the bus station, why they were talking to him, and had asked Defendant if he had any illegal items. Defendant had

14

understood and declined SA Iten's request for consent to search Defendant's bags. After Defendant nodded his head in assent to the dog sniff, he was led outside the bus terminal to place his bags on the ground. TFO Jaworski asked SA Iten to confirm that Defendant understood what was happening, and after SA Iten spoke to Defendant, replied, "Yeah, he knows that the dog's coming." When Deputy Woodward brought Loki out to sniff Defendant's bags, he stood silently by and did not raise any objections. As such, considering the totality of the circumstances, Defendant's words and conduct would cause a reasonable person to believe he comprehended the request and knowingly and voluntarily consented to the dog sniff of his bags.

### III.    Defendant's Detention and Consent to Search his Backpack

Defendant contends that, for similar reasons argued above, his consent to search his backpack after the dog sniff was invalid. Defendant asserts that adding to the invalidity to this consent was TFO Jaworski's threat that they were going to get a search warrant and Defendant was going to miss his bus. (Filing No. 19 at p. 13).

After Deputy Woodward deployed his drug canine Loki, he advised the task force officers on the scene that Loki had indicated to Defendant's backpack. The Eighth Circuit has repeatedly and consistently held that "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Rederick*, 65 F.4th 961, 967-68 (8th Cir. 2023) (quoting *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) and citing *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) (concluding that "the positive alert by a reliable dog alone established probable cause")). "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *United States v. Perez*, 29 F.4th 975, 986 (8th Cir. 2022), *reh'g denied*, No. 21-1191, 2022 WL 1609225 (8th Cir. May 20, 2022) (quoting *Florida v. Harris*, 568 U.S. 237, 246-47 (2013)). The government has sufficiently established Loki's certification and training in drug detection. See Exhibits 9, 11, and 12. Therefore, Loki's indication to Defendant's backpack provided probable cause to search the backpack.

After Loki indicated to Defendant's backpack, TFO Jaworski used the Google Translate app to tell Defendant he was "being detained for investigation," and asked Defendant if he understood.

Defendant asked, "porque," or "why?" TFO Jaworski replied, using the Google Translate app, "The police dog indicated to the odor of drugs coming from your bag." SA Iten then provided Defendant with a basic *Miranda* rights advisory in Spanish because, as SA Iten testified, he did not have his DEA Spanish rights advisory form with him. SA Iten advised Defendant he did not have to say anything "at that time" or "now"; that if Defendant could not afford an attorney, the United States will pay for that attorney; and anything that they were talking about can be used against Defendant in court. See *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (prior to custodial questioning, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."). It was at this time that TFO Jaworski directed SA Iten to tell Defendant they were going to get a warrant and that he was going to miss his bus. SA Iten then spoke to Defendant in Spanish for a moment before relaying Defendant's consent to the search of his backpack "real quick."

Although this was no longer a consensual encounter and Defendant was no longer free to leave, for similar reasons as discussed above, the totality of the circumstances would cause a reasonable person to believe Defendant knowingly and voluntarily consented to the search of his backpack. See *Garcia-Garcia*, 957 F.3d at 895-96. A total of fourteen minutes had passed since TFO Jaworski first contacted Defendant, which is still a relatively short length of time. Defendant was informed the police dog smelled the odor of drugs on his backpack and was given a general *Miranda* rights advisory in Spanish. Officers continued to use conversational tones with Defendant and did not brandish their weapons or otherwise use intimidating body language. Defendant was standing outside the bus terminal and was not surrounded by a large law enforcement presence. Defendant was also not handcuffed at this time. During the search of his backpack, Defendant did not protest or object, but instead stood by and watched the search. Defendant's consent to the search of his backpack was further confirmed because, after he declined another request to search his suitcase, he acknowledged he had said "yes" to the backpack because that is where the dog "found the smell."

Defendant characterizes TFO Jaworski's statement that officers were going to get a warrant and he was going to miss his bus as a "threat." See *United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992) ("An officer's threat to obtain a search warrant is a factor to be considered when examining the totality of the circumstances surrounding consent."). This factor does tend to weigh against voluntariness because after SA Iten relayed that information to Defendant, he immediately consented to a search of his backpack "real quick," suggesting Defendant consented because he did not want to miss his bus. Nevertheless, in context and considering the totality of the circumstances,

TFO Jaworski's statement did not render Defendant's consent involuntary. Here, because Loki had indicated to Defendant's backpack, TFO Jaworski's statement was more a statement of fact as to what officers were going to do next based upon Loki's indication, rather than a threat. See *Rederick*, 65 F.4th at 967-68 (stating a reliable drug dog's alert or indication provides probable cause). And considering the rest of the surrounding circumstances, TFO Jaworski's statement (as translated by SA Iten) did not render Defendant's consent involuntary. *Garcia-Garcia*, 957 F.3d at 895-96; *cf.*, *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018) (finding the defendant's consent was voluntary where the defendant was under arrest, handcuffed, had not been read *Miranda* rights, and was seated in a police car at a public airport, with two officers in his immediate vicinity and "up to ten officers" on the scene; the defendant had only been arrested "for a few moments," there was no evidence he had been threatened, physically intimidated, or punished; and he was a sober middle aged man with no mental defects).

### IV.    The Search Warrant for the Suitcase, the *Leon* Good Faith Exception, and Defendant's Request for a *Franks* Hearing

After officers searched Defendant's backpack and found packing tape (but no contraband), and after making additional observations about Defendant's luggage, TFO Jaworski made the decision to apply for a search warrant for Defendant's suitcase. A Douglas County judge issued the warrant based upon the affidavit drafted by TFO Jaworski at the bus station. Defendant argues the warrant was invalid and the *Leon* good faith exception does not apply because the warrant affidavit relies on information and evidence gathered in violation of his Fourth Amendment rights, as discussed above. Defendant further argues the warrant affidavit was so facially deficient and lacking in probable cause that the *Leon* good faith exception does not apply. Defendant further asserts the *Leon* good faith exception does not apply because the warrant affidavit contained false statements and omissions made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; for the same reason, Defendant also requests a hearing pursuant to *Franks*.

"In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 920 (1984). "Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to

17

be searched." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (internal quotation marks omitted) (quoting *United States v. Davis*, 471 F.3d 938, 946 (8th Cir. 2006)). An issuing judge's determination of probable cause "should be paid great deference by reviewing courts." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010), and the reviewing court's "inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (quoting *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004)). "As 'a practical and common-sens[e] standard,' probable cause leaves plenty of room to draw reasonable 'inferences' from less-than-perfect evidence." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (alterations in original) (quoting *Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020)).

"In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (quoting *Leon*, 468 U.S. at 922 (1984)). Under *Leon*, evidence seized in reliance on a search warrant is not subject to suppression unless:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702-03 (8th Cir. 2017) (citing *Leon*, 468 U.S. at 923). For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, officers' pre-warrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." If "the officers' pre-warrant conduct is 'clearly illegal,' the good-faith exception does not apply." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). "The 'operative test' is 'whether a reasonably well trained officer would have known that the search was illegal [despite the issuing judge's authorization].'" *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021), *reh'g denied* (May 19, 2021) (quoting *United States v. Koch*, 625 F.3d 470, 477 (8th Cir. 2010)).

Here, for the reasons outlined above, the undersigned magistrate judge finds the task force officers' pre-warrant conduct did not violate Defendant's Fourth Amendment rights. Nevertheless,

even if their conduct did violate Defendant's Fourth Amendment rights, at a minimum, their conduct was "close enough to the line of validity" to make the officers' subsequent belief in the validity of the warrant reasonable. See *United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016) (finding the good-faith exception applied to a warrant that depended on evidence obtained as the result of an illegal search or seizure to establish probable cause because objectively reasonable officer could have believed no prior Fourth Amendment violation occurred). Therefore, under the circumstances, the undersigned magistrate judge finds the *Leon* good faith exception would apply even if the warrant was based on evidence obtained through a Fourth Amendment violation.

Further, in reviewing TFO Jaworski's affidavit in support of the search warrant, the undersigned magistrate judge concludes the issuing judge had a substantial basis to conclude probable cause existed. The warrant affidavit contained the following information: Defendant was traveling to Raleigh from Los Angeles to visit family for "a few days to a few weeks"[6] with a one-way bus ticket and had not purchased a return trip; Defendant stated he began his trip in Los Angeles and later stated he was coming from Mexico;[7] in TFO Jaworski's training and experience, Los Angeles is a source area for controlled substances; SA Iten, a Spanish speaker, explained to Defendant that he appeared nervous and had made multiple trips to the bathroom; SA Iten asked Defendant if he was transporting weapons or drugs, and Defendant said he was not transporting anything illegal; SA Iten asked Defendant for consent to search of his bags, and Defendant denied consent; SA Iten asked Defendant "if he would allow a police K9 to sniff the bags" and Defendant consented; Deputy Woodward deployed his narcotic detection canine Loki conducted a sniff of Defendant's luggage; Deputy Woodward "advised there was an alert and indication to the odor of narcotics on the black backpack and an alert to the odor of narcotics from the black soft sided suitcase;"[8] Deputy Woodward and Loki were last certified in April of 2022 and were currently certified at the time of the deployment; SA Iten advised Defendant of his rights in Spanish and explained the police dog alert to the "bag"; Defendant consented to a search of the backpack; during

---

[6] Defendant contends this is false because he did not say "few days to a few weeks," and instead the Google Translate app created the miscommunication; as such, this statement incorrectly implies Defendant was attempting to be evasive. (Filing No. 19 at p. 17).

[7] Defendant contends this is misleading because Defendant had told TFO Jaworski he was coming from Los Angeles and his "home" was Mexico, again falsely suggesting evasiveness. (Filing No. 19 at p. 17).

[8] Defendant contends this is inaccurate because after the dog sniff, "TFO Woodward advised that the dog had indicated to the backpack. He only ponied up the 'alert' to the suitcase after the other officers had found nothing in the backpack and tried to get him to change his conclusion." (Filing No. 19 at p. 17).

19

the search of his backpack, TFO Jaworski found clothes and a roll of packing tape in the bag; TFO Jaworski knows that tape is commonly used to wrap controlled substances; Defendant stated the tape was for a gift, but he did not have the gift; TFO Jaworski noticed the suitcase had a small piece of the same tape affixed to the outside of the suitcase; TFO Jaworski also noticed the suitcase's luggage tag was not completely filled out and only stated the destination of Raleigh, North Carolina with no name; Defendant granted consent to search his backpack but not his suitcase; and that based on his training and experience and the alert by the police canine, TFO Jaworski believed evidence related to the distribution of controlled substances will be located in the suitcase.

Reading these facts in a practical and commonsense manner, the undersigned magistrate judge finds the issuing judge had a substantial basis for concluding that probable cause existed to issue the search warrant for Defendant's suitcase. Regardless of Defendant's issues with how TFO Jaworski phrased Defendant's travel plans, the affidavit reflects Defendant had planned a relatively short trip with a one-way bus ticket from a source-area for controlled substances, officers perceived Defendant's nervousness and multiple bathroom trips, a certified drug canine alerted and indicated to Defendant's backpack and alerted to his suitcase, officers found packing tape in Defendant's backpack that Defendant stated was for a gift that he did not have in his possession, TFO Jaworski knows from his training and experience that tape is commonly used to wrap controlled substances, TFO Jaworski observed a piece of corresponding tape affixed to the suitcase, and the suitcase's luggage tag only had a destination but no name. Taken together and drawing reasonable inferences from these facts, there was a substantial basis to conclude evidence related to the distribution of controlled substances would be located in the suitcase. See also *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988) (citing *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983)) (A court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals.").

Defendant spends a significant amount of time explaining the difference between a drug canine "alert" and "indication," and asserts the warrant affidavit fatally omits an explanation of the legal/scientific distinctions between the two. But, "[O]nly that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). And the warrant affidavit clearly described that the drug canine gave an "alert and indication to the odor of narcotics on the black backpack," and only "an alert to the odor of narcotics from the black soft sided suitcase," which is

20

an accurate statement of Loki's results as testified by Deputy Woodward. As recently as last year, the Eighth Circuit reaffirmed the framework for determining whether a drug dog sniff is reliable enough to establish probable cause:

> [T]he framework courts should use to determine whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search . . . is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."

*United States v. Perez*, 29 F.4th 975, 986 (8th Cir. 2022) *reh'g denied*, No. 21-1191, 2022 WL 1609225 (8th Cir. May 20, 2022) (quoting *United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014)). "The positive alert by a reliable dog alone established probable cause." *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016). A search warrant affidavit "need only state the dog has been trained and certified to detect drugs" and "need not give a detailed account of the dog's track record or education." *Id.* (quoting *United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir. 2006)).

Here, the affidavit contained the information that Loki has been trained and certified to detect drugs, and described the facts surrounding Loki's alert to Defendant's suitcase and indication to his backpack. This was not a warrantless search premised solely upon Loki's indication. Instead, the issuing judge also had the benefit of reviewing the facts and context in which Loki made the alert and indication when issuing the warrant. The reliable canine's alert to Defendant's suitcase, in combination with the other facts outlined above, "viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." Because the search warrant affidavit stated that Loki had been trained and certified to detect drugs, *Jackson*, 811 F.3d at 1052, and contained other facts surrounding Loki's alert and indication, *Perez*, 29 F.4th at 986, the undersigned magistrate judge concludes the affidavit was not deficient because it did not explain the legal/scientific distinctions between an alert and full indication, and established probable cause to search Defendant's suitcase.

Defendant's request for a *Franks* hearing is premised upon the same asserted omissions/misstatements supporting his argument that the *Leon* good faith exception does not apply. Specifically, Defendant argues he is entitled to a *Franks* hearing because: (1) the affidavit "made no indication that [Defendant] had difficulty understanding certain concepts or terms" and instead "implied" the miscommunications were Defendant's attempts to be evasive; (2) the affidavit misleadingly states that, after the canine sniff, Deputy Woodward immediately "advised there was an alert and indication to the odor of narcotics on the black backpack and an alert to the odor of

narcotics from the black soft sided suitcase" because Deputy Woodward waited to advise the task force about the alert; and (3) "the affidavit did not explain the legal/scientific distinctions between an alert and full indication." (Filing No. 19 at p. 17).

A criminal defendant may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination. See *Franks*, 438 U.S. at 155-56. In order for a defendant to prevail on a request for a *Franks* hearing, the defendant must make a "substantial preliminary showing" that (1) the affiant "knowingly and intentionally" made reckless false statements or omissions and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause. *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008). A defendant must show "by a preponderance of the evidence that an affidavit including [the omitted] information could not support a finding of probable cause." *United States v. Miller*, 11 F.4th 944, 952-53 (8th Cir. 2021). "The requirement of a substantial preliminary showing is not lightly met[.]" *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)). "Allegations of negligence or innocent mistake are insufficient," for a hearing. *Franks*, 438 U.S. at 171.

At the evidentiary hearing, the undersigned magistrate judge made an initial finding that Defendant had not made a substantial preliminary showing of misstatements or omissions necessary to obtain a *Franks* hearing. (TR. 15-16). The undersigned magistrate judge now reaffirms that Defendant has not made a substantial preliminary showing. Here, the alleged misstatements of information in the warrant affidavit regarding Defendant's travel plans that "implies" or "suggests" evasiveness falls short of the standard under *Franks*. There is no evidence TFO Jaworski knowingly disregarded the truth in his warrant affidavit in order to mislead the issuing judge. A misstatement must be the product "of deliberate falsehood or of reckless disregard for the truth. . . . Allegations of negligence or innocent mistake are insufficient." *United States v. Williams*, 477 F.3d 554, 559 (8th Cir. 2007) (quoting *Franks*, 438 U.S. at 171).   Defendant offers nothing more than this bare assertion that TFO Jaworski acted intentionally or recklessly, which is "insufficient to make the difficult preliminary showing." *United States v. Short*, 2 F.4th 1076, 1080 (8th Cir. 2021) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) ("A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing.").  Additionally, Defendant has not shown

that even if Defendant's statements regarding his travel were excised from the affidavit that the affidavit no longer established probable cause.  See *Snyder*, 511 F.3d at 816.

Defendant further asserts TFO Jaworski recklessly/intentionally omitted the fact that Deputy Woodward initially only advised the task force officers that Loki had indicated to the backpack, and advised them of Loki's alert to the suitcase after the search of the backpack did not uncover contraband.  "Where the defendant's claim is that the affiant intentionally or recklessly omitted material information from the affidavit, 'reckless disregard for the truth may be inferred  . . . only when the material omitted would have been clearly critical to the finding of probable cause.'" *United States v. Randle*, 39 F.4th 533, 537-38 (8th Cir. 2022).   The timing of Deputy Woodward's advisement of Loki's alert would not have been clearly critical to the finding of probable cause. Similarly, for the reasons discussed above, the search warrant affidavit did not recklessly omit a legal/scientific explanation of the difference between and alert and indication because a search warrant affidavit "need only state the dog has been trained and certified to detect drugs" and "need not give a detailed account of the dog's track record or education," *Jackson*, 811 F.3d at 1052, and thus that information would not have been clearly critical to the finding of probable cause.  Simply put, there is no evidence that TFO Jaworski included or omitted facts with the intent to make, or in reckless disregard of whether the omissions made, the affidavit misleading. Accordingly, Defendant has not made substantial preliminary showing to prevail on his request for a *Franks* hearing.

Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing(s) for the Motion to Suppress and under *Franks v. Delaware* (Filing No. 18) be denied.

Dated this 17ᵗʰ day of July, 2023.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such

objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.