## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | **8:23CR02** |
| vs. | **SUPPLEMENTAL FINDINGS AND AMENDED RECOMMENDATION** |
| EDUARDO GONZALEZ-MORENO, | |
| **Defendant.** | |

This matter is again before the undersigned magistrate judge on the Motion to Suppress Evidence and Request for Evidentiary Hearing(s) for the Motion to Suppress and under *Franks v. Delaware* (Filing No. 18) filed by Defendant, Eduardo Gonzalez-Moreno. Defendant moves to suppress evidence and statements obtained from an encounter with law enforcement at the Omaha Trailways bus station, including evidence seized from his suitcase pursuant to a warrant. Defendant contends the seizure of his person and luggage violated his Fourth Amendment rights; the subsequently procured warrant was based upon those Fourth Amendment violations; and the *United States v. Leon*, 468 U.S. 897, 920-922 (1984) good faith exception does not apply.

The undersigned magistrate judge held an evidentiary hearing on the motion on May 22, 2023, receiving testimony from Nebraska State Patrol Investigator Nicholas Jaworski (TFO Jaworski); Drug Enforcement Administration (DEA) Special Agent Christian Iten (SA Iten); Douglas County Sheriff's Office Deputy Andrew Woodward (Deputy Woodward); and Nebraska State Patrol Officer Nicholas Bonney (TFO Bonney). The government's exhibits 1 to 12, and Defendant's exhibits 101 to 111, were received into evidence. A transcript of the hearing was prepared and filed on June 16, 2023. (Filing No. 39). On July 17, 2023, the undersigned magistrate judge issued a Findings and Recommendation (Filing No. 40) recommending the Court deny the motion to suppress, and finding Defendant failed to make the "substantial preliminary showing" necessary to warrant a *Franks* hearing.

Defendant timely objected (Filing No. 45) to the Findings and Recommendation, raising five specific objections: (1) the undersigned magistrate judge erred in concluding Defendant's initial interaction with law enforcement was consensual and not a detention; (2) the undersigned magistrate judge erred in concluding Defendant knowingly consented to the drug canine sniffing his bags; (3)

the undersigned magistrate judge erred in concluding the drug canine was reliable[1]; (4) the undersigned magistrate judge failed to make "findings about the propriety of removing [Defendant] and his suitcase from the stream of commerce . . . while the warrant was sought"; and (5) the undersigned magistrate judge erred in concluding "the warrant was valid and that the *Leon* good faith exception protects the execution of the warrant."  The government filed a response (Filing No. 46) to Defendant's objections, asking the Court to overrule the objections in their entirety.  The government did not object to the undersigned magistrate judge's Findings and Recommendation, but did "take issue" with the finding that, under *United States v. Jones*, 990 F.2d 405 (8th Cir. 1993), Defendant was detained during the dog sniff.  (Filing No. 46 at pp. 3-4).

Upon an initial de novo review, Chief Judge Rossiter found Defendant "raises salient questions about some of the magistrate judge's analysis of pertinent issues in this case."  Specifically, Chief Judge Rossiter stated, "it is not entirely clear from the record thus far that [Defendant] knowingly and voluntarily consented" to the dog sniff, and took note of the government's issue with the conclusion that Defendant was detained during the dog sniff of his bags.  As such, Chief Judge Rossiter referred the matter back to the undersigned magistrate judge for additional analysis "on these contentious issues, including [Defendant]'s purported consent to the dog sniff."  Chief Judge Rossiter also requested "the magistrate judge elaborate on the currently limited findings about [the drug canine]'s reliability and the seizure of [Defendant's] suitcase" as to Defendant's third and fourth objections, and resubmitted the matter to the undersigned magistrate judge for further review.  (Filing No. 47 at p. 3).

On September 28, 2023, the undersigned magistrate judge held a telephone conference with counsel for the parties regarding the Court's order resubmitting the matter for further review.  Following discussion with counsel, the matter was set for further evidentiary hearing.  (Filing No. 50).

The second evidentiary hearing was held on October 26, 2023.  Defendant was present with his attorney, Richard H. McWilliams.  The government was represented by Special Assistant United States Attorney, Joseph P. Meyer.  SA Iten and TFO Jaworski again testified for the government.  Dr. Jeck-Jenard Navarrete,[2] a Spanish Language Interpreter, testified on behalf of Defendant.  The

---

[1] Specifically, Defendant objects, "Dogs aren't magic."  (Filing No. 45 at p. 5).

[2] Dr. Navarrete is employed as an interpreter with the office of the Federal Public Defender, District of Nebraska.  Dr. Navarrete obtained a PhD in linguistics and modern languages and literatures, with an emphasis in Spanish, from the University of Nebraska, Lincoln, in 1993.  Dr. Navarrete also holds a master's degree in Spanish

parties were given leave to file additional briefing by November 9, 2023, but chose not to.  The transcript of the evidentiary hearing was filed on November 20, 2023.  (Filing No. 56).  The resubmitted matter is now fully ready for further review and analysis.  For the following reasons, the undersigned magistrate judge amends his previous recommendation that Defendant's motion be denied, and instead will recommend to Chief Judge Rossiter that Defendant's motion to suppress be granted.

## PREVIOUS FACTUAL FINDINGS

The undersigned magistrate judge previously set forth factual findings from the exhibits and testimony adduced at the first evidentiary hearing.  (Filing No. 40 at pp. 2-9).  To summarize and recap those factual findings, in the early morning hours on November 3, 2022, members of a DEA Criminal Interdiction Unit task force, including TFO Jaworski, SA Iten, and TFO Bonney, were conducting interdiction at the Trailways Bus Station in Omaha.  At approximately 5:30 a.m., Defendant arrived at the Omaha bus station on a bus that originated in Denver.  All passengers are required to get off the bus for a driver change during this stop in Omaha, but they are not required to remove their luggage or stay in the terminal.  The length of the stop in Omaha varies, but it generally lasts between 20 to 30 minutes.  Task Force Officers' attention was drawn to Defendant during this stop because he was "moving around" the bus terminal, he had "gone to the restroom a couple times," and he had several elastic bands for luggage tags, and only had one luggage tag on his luggage.  Defendant was traveling with a satchel, a backpack, and a small carry-on size suitcase.

TFO Jaworski first contacted Defendant as he walked out of the restroom and towards the lobby.  TFO Jaworski approached Defendant, displayed his badge, and identified himself as a police officer.  TFO Jaworski told Defendant he was not in any trouble and was not under arrest.  Defendant indicated he did not speak English, and TFO Jaworski does not speak Spanish, so TFO Jaworski utilized a Google Translate application ("the Google Translate app") on his phone in "conversation mode" to again advise Defendant that he was a police officer, that Defendant was not in trouble or under arrest, and asked Defendant if he understood.  Defendant nodded his head in the affirmative and said "si." TFO Jaworski asked Defendant if he "had a second to talk," and Defendant nodded his head in the affirmative.

_____

linguistics from the University of Nebraska, Lincoln.  Dr. Navarrete obtained his law degree in 1982 from Universidad Iberoamericana, Mexico City.  The government stipulated Dr. Navarrete is an expert in the Spanish language.  (Filing No. 56 at pp. 50-52).

Using the Google Translate app, TFO Jaworski asked Defendant about his travel plans. TFO Jaworski understood Defendant was traveling from Los Angeles and was going to Raleigh, North Carolina to visit a cousin, and his "home" is Mexico. TFO Jaworski asked Defendant how long he was going to stay in North Carolina. TFO Jaworski testified there was some slight confusion because the Google Translate app stated Defendant's answer was a "few weeks, a few days"; TFO Jaworski clarified with Defendant as to whether he meant weeks or days, and Defendant replied, "dias," as in days. TFO Jaworski checked Defendant's bus ticket and noticed it was for one-way travel. TFO Jaworski sought the assistance of SA Iten, who testified he speaks Spanish, (Filing No. 39 at p. 81), for further conversation with Defendant in Spanish.

SA Iten testified he acted as TFO Jaworski's translator, and asked about Defendant's travel plans and explained to Defendant what the officers were doing at the bus station. Defendant told SA Iten he was going to be in North Carolina for about a week, stated he had not been to North Carolina before, was going to stay with family, and was going to buy his return ticket after he got to North Carolina. SA Iten asked Defendant if he had any illegal drugs or items on him, and Defendant replied no.

About six minutes into the encounter, TFO Jaworski asked SA Iten to ask Defendant for consent to search his bags. SA Iten conversed with Defendant for approximately two minutes regarding that request. Defendant did not consent to a search of his bags. SA Iten then attempted to obtain Defendant's consent for a dog to sniff his bags by using the word "perro" (Spanish for "dog") and "sentir" (French for "to smell") and touching his nose with his hands. Defendant nodded his head in the affirmative.

Task force officers led Defendant through a back door to the outside of the bus terminal. Defendant carried his three bags outside and placed them on the pavement along the exterior wall of the west side of the bus terminal building. While Defendant was placing his luggage on the pavement, TFO Jaworski asked SA Iten, "Does he understand what's going on?" SA Iten spoke to Defendant in Spanish, and replied to TFO Jaworski, "Yeah, he knows that the dog's coming." TFO Jaworski approached TFO Bonney to update him on the situation, and stated, "I don't know if he completely understands consent. [SA Iten] went through it a couple times and it sounds like he didn't want to allow a search of the bags, so we just went to this."

Deputy Woodward was working at the bus station with his drug canine, Loki. Deputy Woodward has been a canine handler for 12 years, and has been with Loki for seven years. Loki is certified as a narcotics indicating canine, which includes marijuana, methamphetamine, heroin, and

4

cocaine, but not fentanyl. Deputy Woodward and Loki recertify every year. Deputy Woodward was asked to deploy Loki to sniff Defendant's three pieces of luggage. Deputy Woodward deployed Loki from the north to the south in order to "get Loki's nose into . . . the wind." Deputy Woodward testified Loki alerted to the suitcase and gave an indication to the backpack, but initially only told the task force officers about the backpack indication.

Deputy Woodward testified an alert is "an untrained behavior when the dog is in an odor of a narcotic." Deputy Woodward testified that Loki alerts by "becom[ing] nasally" and his "tail will start wagging, and you'll see him working in the area of where the odor is emanating from." Deputy Woodward testified an indication is "the final behavior when the dog is in an odor of one of the four odors that it is trained on." Loki's indication is to "take a deep breath" and either stand and stare, sit down and stare, or lay down and stare because he is a passive-indicating dog. Deputy Woodward testified there cannot be an indication without an alert, and an alert always precedes an indication. Deputy Woodward testified he initially only advised task force officers of Loki's indication to the backpack because in his view "the indication was more important than the alert was at that time."

After Deputy Woodward advised of Loki's indication to the backpack, TFO Jaworski directed SA Iten to advise Defendant of his rights. SA Iten stated he did not have a rights advisory form in Spanish and asked TFO Jaworski to use the Google translate app. TFO Jaworski used the Google Translate app to tell Defendant he was "being detained for investigation," and asked Defendant if he understood. Defendant asked "porque?" TFO Jaworski replied, using the Google Translate app, "The police dog indicated to the odor of drugs coming from your bag." SA Iten needed to continue with the rights advisory, but since he had misplaced his DEA Spanish rights advisory form, SA Iten replied he could "fake it" to advise Defendant of his rights in Spanish without reference to the form. SA Iten advised Defendant he did not have to say anything "at that time" or "now" ("ahora"); that if Defendant could not afford an attorney, the United States will pay for that attorney; and anything that they were talking about can be used against Defendant in court. TFO Jaworski asked SA Iten to tell Defendant they were going to get a warrant and that he was going to miss his bus. SA Iten spoke to Defendant in Spanish and then conveyed Defendant's consent to search his backpack "real quick."

During the search of Defendant's backpack, officers found clothing and a roll of brown packing tape, but no contraband. TFO Jaworski asked SA Iten to ask Defendant what the tape was for. Defendant replied it was for a gift. TFO Jaworski asked where the gift was, and Defendant replied not with him or not here. In TFO Jaworski's training and experience, he found the packing

5

tape suspicious because "kilos" of illegal narcotics are occasionally wrapped with brown packing tape.  TFO Jaworski testified it was the type of brown packing tape that he would use on boxes, rather than Scotch or clear tape typically used for gifts. TFO Jaworski asked SA Iten to clarify whether Defendant was going to let them "search all of them."  TFO Bonney also spoke to Defendant using the Google Translate app and asked for consent to search the suitcase.  TFO Bonney pointed to the suitcase to make it clear which bag he was asking to search.  SA Iten conveyed Defendant's statement that he was not providing his consent to search the suitcase because the dog only found the smell on the backpack.

TFO Jaworski noticed there was a piece of brown packing tape similar to the tape found in the backpack placed on the side of the suitcase, which he believed meant the backpack and suitcase belonged together.  He also noticed the suitcase's luggage tag only had a destination and not a name, which he found suspicious because "if someone is transporting controlled substances or illegal items, whether it be weapons, whatever, they'll put limited information on the tag in the event that they're encountered with law enforcement, to kind of distance themselves and attempt to distance themselves from the bag."

After the search of Defendant's backpack, task force officers discussed the next steps in light of Defendant's continued non-consent to a search of his suitcase, including obtaining a search warrant.  TFO Bonney also asked Deputy Woodward if he wanted to move the luggage inside so that the wind would not affect Loki; Deputy Woodward testified he was "fine with the way the deployment went" and at that time advised task force officers that Loki had alerted to the suitcase in addition to indicating to the backpack.  Deputy Woodward did not deploy Loki a second time.

As Defendant had not consented to the search, TFO Jaworski decided to apply for a search warrant for Defendant's suitcase based on the information Defendant provided about his travel itinerary, the alert and indication on the backpack, the alert to the suitcase, the luggage tag not being completely filled out, and the brown packing tape found inside the backpack with corresponding tape on the suitcase.  Task force officers decided to detain Defendant pending procurement of the search warrant after learning he was not a U.S. Citizen and not a local resident.  While officers were talking to Defendant outside the bus terminal, the bus driver was waiting to leave until the officers finished their conversation with Defendant to see if he would be allowed to reboard.  TFO Jaworski confirmed Defendant would be detained pending procurement of a search warrant.  The bus left the terminal and Defendant was handcuffed after approximately 22 minutes from the beginning of the encounter.  Defendant was kept handcuffed and seated in a back room of the bus station while TFO

Jaworski typed a search warrant affidavit and presented the warrant to a Douglas County county court judge for authorization. TFO Jaworski returned to the bus station to serve and execute the warrant, approximately 70 minutes after he had left. In searching the suitcase, officers located two kilo bricks wrapped in brown packing tape later determined to be fentanyl. Defendant was 23 years old at the time of the encounter. (Filing No. 40 at pp. 2-9).

### SUPPLEMENTAL FACTUAL FINDINGS

The undersigned magistrate judge makes the following additional factual findings based upon the testimony received at the October 26, 2023, evidentiary hearing, as well as exhibits and testimony offered at the first evidentiary hearing:

SA Iten testified he asked Defendant for consent to search his bags using the phrase, "Podemos buscar tus maletas," which translates to, "May we search your bags?" (Filing No. 56 at p. 8-9; Ex. 1 at 6:00-6:52). SA Iten testified Defendant did not give an affirmative response to the question, but instead "he asked me kind of why." SA Iten testified he then had "kind of the same discussion we had when we had the initial encounter of why we were talking to him," and explained the task force officers' observations: "Him using the bathroom. He seemed a little nervous. The details of his trip." After this discussion, SA Iten again asked Defendant for permission to search his bags, but SA Iten understood Defendant to have not consented to a search because "there was also just no kind of an equivocation, a -- a yes or a no answer." SA Iten did not perceive that Defendant was having trouble comprehending him during their several minute conversation. (Filing No. 56 at pp. 9-10). SA Iten did not explicitly tell Defendant in Spanish he was free to leave, that he was free to decline consent to a search of his luggage, or free to decline consent to the dog sniff. (*Id.* at p. 26).

SA Iten made the decision to "change gears to ask permission to have the dog sniff the bags," rather than for consent to search the bags, because Defendant's next bus had made the announcement it was beginning to load. (*Id.* at p. 11). SA Iten used the following Spanish phrase to ask consent for the dog sniff: "Podemos utilizar un perro sentir tus maletas." (*Id.* at p. 12; Ex. 1 at 8:09-8:30). SA Iten testified "sentir" is French for "to smell," and the better word in Spanish would have been "oler." SA Iten testified that after he testified at the first hearing, he used internet resources to research the word "sentir," and learned it is also a Spanish verb for "to sense" or "to feel." (Filing No. 56 at pp. 12-13). SA Iten testified his understanding that his words, "Podemos utilizar un perro

sentir tus maletas," translated to, "Can we use our dog to feel/sense your bags, the bags?" (*Id.* at p. 14). In response, Defendant gave "kind of a nod yes." (*Id.* at p. 30).

SA Iten testified further regarding his conversation with Defendant outside the bus terminal after TFO Jaworski asked SA Iten, "Does he understand what's going on?" (Filing No. 40 at p. 5). After watching a portion of Exhibit 1 to refresh his recollection, SA Iten testified he spoke to Defendant to ask him if he understood, stating, "me entiendes," which means, "Do you understand me," followed by "y tu entiendes ah...tu comprendes que usar un perro," while pointing towards Defendant's bags to ask, "Do you understand, do you comprehend that the -- the dogs are coming to the bags?" SA Iten testified he only recalls that Defendant replied, "si." SA Iten did not use the word "oler" or otherwise ask Defendant if he knew the dogs were coming to smell his bags. SA Iten then replied to TFO Jaworski, "He knows the dog is coming." (Filing No. 56 at pp. 15-20, 24-25; Ex. 1 at 9:00-9:30). When Deputy Woodward arrived with Loki, SA Iten and Defendant "stood by and just watched the dog do dog things." (Filing No. 56 at p. 17).

On cross-examination, SA Iten testified regarding his understanding as to how to ask a question in Spanish. Specifically, SA Iten agreed that a rise of intonation at the end of sentence is a way to indicate the verb is asking a question. SA Iten testified that, if there is no rise in the intonation at the end of the sentence, a "direct" translation of "podemos utilizar un perro" is, "We can use a dog." Similarly, if there is no rise in intonation at the end of the sentence, "Podemos utilizar un perro sentir olores," the words directly translate to, "We can use a dog to sense smells." Likewise, the phrase, "y tu entiendes ah...tu comprendes que usar un perro," without intonation at the end, is a statement directly translated to, "You understand, you comprehend that to use a dog." SA Iten testified on cross-examination that yes, he would be concerned an individual did not comprehend what has been going on if the individual replied, "bueno pues, si," which translates to, "Well, yes, yeah." (Filing No. 56 at pp. 22-25, 55).

On re-direct, SA Iten testified he could not recall the intonation he was using to ask Defendant questions. Due to SA Iten "being a limited Spanish speaker" and not "completely fluent," rather than asking Defendant "open-ended questions," he tried "to form his questions into more closed-ended" ask-and-answer questions. SA Iten testified that, throughout their conversation, SA Iten asked Defendant other questions, and Defendant generally responded to those questions. SA Iten clarified that, if Defendant's response to "y tu entiendes ah...tu comprendes que usar un perro" was, "bueno pues, si," it did not give SA Iten reason to think Defendant was not comprehending him. (Filing No. 56 at pp. 27-28).

Dr. Navarrete, a federally certified Spanish-speaking interpreter, testified as a Spanish language expert. (Filing No. 56 at pp. 50-52). Dr. Navarrete reviewed Exhibit 1 (TFO Jaworski's body-worn camera footage) and testified regarding the Spanish phrases utilized by SA Iten during the encounter with Defendant. Dr. Navarrete testified he "worked with" the footage for "quite a bit of time." Because the footage took place in public in different locations both indoors and outdoors, with other external noise and voices, including the bus station PA system, Dr. Navarrete testified he replayed the footage repeatedly. He testified he "did not focus so much on the visual," other than to determine who was speaking. (*Id.* at pp. 56-57, 59).

Dr. Navarrete testified a direct translation of "podemos utilizar un perro" with a rise in intonation at the end of the phrase would be, "Can we use a dog?" With no rise in intonation at the end of the phrase, the direct translation would be, "We can use a dog." (*Id.* at pp. 52-53). Dr. Navarrete testified the phrase, "podemos utilizar un perro para sentir olores" with no rise in intonation at the end of the phrase directly translates to "We can use a dog to sense smells." With no rise in intonation at the end, it is a declarative statement, not a question. (*Id.* at pp. 53-54). Based upon Dr. Navarrete's review of Exhibit 1, he testified SA Iten did not use a rise of intonation at the end of either statement. (*Id.* at p. 54).

Dr. Navarrete testified SA Iten did use an intonation at the end of the phrase, "me entiendes," which would translate to the question, "Do you understand me?" Dr. Navarrete testified SA Iten did not use a rise in intonation at the end of his statement, "y tu entiendes ah...tu comprendes que usar un perro," which would directly translate to the declarative statement, "We can use, we can utilize a dog," or "You understand, you comprehend that to use a dog." (Filing No. 56 at pp. 54-55).

Dr. Navarrete testified that the Spanish word "sentir" is a "sensorial perception verb," and that "the first link to it would be tangential meaning by your touch, by touch." Dr. Navarrete testified it is also "accepted to feel the presence of something," so "you can perceive a smell with it, but it is not the first verb the Spanish would use for perceiving a smell." (Filing No. 56 at pp. 58-59).

TFO Jaworski testified further regarding the drug dog utilized, Loki. TFO Jaworski testified that, although he is not Loki's handler, he is on the same task force as Loki's handler, Deputy Woodward. Prior to the events at issue, TFO Jaworski had observed "at least ten" K-9 sniffs involving Loki. (Filing No. 56 at pp. 32-33). TFO Jaworski testified that, even though Loki had a specific incident when he failed to alert or indicate to the odor of narcotics in a package in which marijuana was found, he did not question Loki's reliability because "Dogs can miss things. Humans can miss things," and narcotics traffickers "have come up with ways to hide the odor or put covert -

- covert odors on it to help defeat the dog." (*Id.* at p. 34, 45). On cross-examination, TFO Jaworski testified he does not recall another incident that took place at a UPS facility on September 9, 2022,[3] where Loki alerted and indicated to a parcel that contained no narcotics, but instead contained purses. TFO Jaworski testified he would not dispute that incident occurred, and he could independently recall situations in the previous year where Loki indicated to the presence of drugs, resulting in a search that revealed no drugs. (*Id.* at pp. 46-47; Ex. 109).

Loki's deployment records from the prior year were received into evidence at the first evidentiary hearing, and Deputy Woodward previously testified regarding Loki's performance history. (Ex. 109; Filing No. 39 at pp. 128-141). The records reflect that, including the instant deployment, Loki was deployed 21 times in the prior year. Of these deployments, Loki indicated 15 times. Fourteen of those had a known result where the bags were searched; of those searches, nine resulted in recovery of contraband; one had an unknown result because it did not make it into the report; and five resulted in no contraband being found. Deputy Woodward testified that, in his experience and training as a canine handler, a drug dog might indicate to an item that does not contain contraband due to transfer of odor. And, a drug dog might not indicate or alert to a particular item that does contain narcotics because the packaging may have prevented the odor of narcotics from emanating out of the parcel. (Filing No. 39 at p. 143). Loki is certified as a narcotics' indicating canine, which includes marijuana, methamphetamine, heroin, and cocaine. Deputy Woodward is Loki's second handler, and they first became certified for drug odor detection in February or March of 2016, and have recertified every year thereafter. They received their recertification on April 25, 2022. (*Id.* at pp. 110-112; Ex. 9). Deputy Woodward and Loki generally train for drug detection once a week for a four-hour block. (*Id.* at pp. 113-114; Ex. 12).

TFO Jaworski testified Defendant was "detained" after Loki indicated to the backpack. TFO Jaworski testified he detained Defendant because of Defendant's "multiple trips to the bathroom," Defendant's one-way ticket from the west coast to stay "a few days" at his destination, and because of Loki's indication to Defendant's backpack. TFO Jaworski seized all three of Defendant's bags at the same time because Defendant had been traveling with them. (Filing No. 56 at pp. 34-38). TFO Jaworski confirmed Defendant's three pieces of luggage were in the possession of law enforcement and were not continuing on the journey to Raleigh pending law enforcement's application for a search warrant. (*Id.* at pp. 39-40). When TFO Jaworski was asked whether he allows a traveler to

---

[3] Not March 9, 2022, which the transcript reflects defense counsel did indeed initially state. (Filing No. 56 at pp. 46-47).

decide whether to reboard their bus and "continue on their way" or stay behind with the luggage after it has been seized pending procurement of a search warrant, TFO Jaworski replied that he did not "think I personally have ever allowed the person to continue" to re-board  their bus and travel to their destination, but it was "certainly possible that someone did do that."  (*Id.* at p. 40).

At the close of the second evidentiary hearing, counsel made additional oral arguments.  The government maintains its position that, although SA Iten communicated an "imperfect translation" asking for Defendant's consent to a dog sniff of his bags, Defendant's behavior and surrounding circumstances reflect he comprehended the request.  (Filing No. 56 at pp. 61-66).  The government acknowledges Loki's deployment records renders him "64 percent reliable," but unlike a roadside search under the automobile exception, the search of Defendant's suitcase was performed pursuant to a search warrant that contained a probable cause finding based upon Loki's alert plus other factors.  (*Id.* at pp. 66-67).  The government asserts probable cause existed for Defendant's arrest after Loki indicated to the odor of narcotics from Defendant's backpack.  (*Id.* at pp. 67-68).

Defendant maintains his consent to the dog sniff was invalid.  Defendant asserts that SA Iten first asked Defendant in Spanish, "May we search your luggage," but when Defendant declined, SA Iten's follow-up Spanish statements were declarative statements—"We can use a dog" and "We can use a dog to sense smells"—not questions.  In other words, Defendant views SA Iten's Spanish statements as "explaining their authority in these situations to circumvent the denial of the consent to search."  (*Id.* at pp. 69-70).  Defendant further contends Defendant was not only detained, but arrested, because he missed his bus and was held by law enforcement for over an hour and a half.  (*Id.* at p. 73).  With respect to the luggage itself, Defendant asserts that any probable cause or reasonable suspicion dissipated after the search of the backpack revealed no contraband; Loki's alert to the suitcase, in context with Loki's reliability, did not provide law enforcement with reason to pull the suitcase "out of the stream of commerce" or detain Defendant.  (*Id.* at p. 75).

## ANALYSIS

As set forth in Chief Judge Rossiter's Order, the matter was referred back to the undersigned magistrate judge for additional analysis on the issues surrounding Defendant's purported consent to the dog sniff; Loki's reliability; and the propriety of removing Defendant and his suitcase seizure from the stream of commerce while the warrant was sought.  (Filing No. 47).

11

## I.    Defendant's Consent to the Canine Sniff

In the Findings and Recommendation (Filing No. 40), the undersigned magistrate judge concluded, "[C]onsidering the totality of the circumstances, Defendant's words and conduct would cause a reasonable person to believe he comprehended the request and knowingly and voluntarily consented to the dog sniff of his bags."  Having the benefit of supplemental testimony and after further consideration of the evidence, the undersigned magistrate judge now amends his previous conclusion and instead finds Defendant's consent to the canine sniff was not valid.

Consent must be knowing and voluntary. The government has the burden of proving by a preponderance of the evidence that a defendant's consent was freely given.  See *United States v. White*, 81 F.3d 775, 780 (8th Cir. 1996). In determining whether this burden is met, the court considers the totality of the circumstances, including both the characteristics of the accused and the environment in which the consent was given.  *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008) (citing *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990)). When assessing the voluntariness of a consent, suspect characteristics which may be relevant include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Griffith*, 533 F.3d at 984.

Relevant environment characteristics include:

> [W]hether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) objected to the search or stood silently by while the search occurred.

*Id.*  These factors are not to be applied mechanically but serve as a guide.  Whether an individual knowingly and voluntarily consented "turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented."  *United States v. Garcia-Garcia*, 957 F.3d 887, 892 (8th Cir. 2020) (quoting *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018)).

"Consent-to-search cases involving translated requests present a threshold question of comprehension."  *Garcia-Garcia*, 957 F.3d at 892 (citing *United States v. Gallardo*, 495 F.3d 982,

12

988 (8th Cir. 2007)). The Eighth Circuit has "previously suggested that a reasonable officer would not believe that a suspect consented where there is a clear lack of comprehension by the listener" because a "reasonable officer would only believe a suspect consented if he believed the suspect understood the request." *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). "In the context of an imperfect translation, [courts] look to indicators that would give a reasonable officer confidence that the suspect comprehended the request." *Id.* These indicators include:

> whether the "context of the conversation" made the officer's meaning reasonably apparent . . .; whether the suspect responded in appropriate ways suggesting comprehension . . .; and whether the officer relied on a translation produced by a reliable source such as a translator . . . , or an approved foreign-language consent form[.]

*Id.* (internal citations omitted). No factor is dispositive, and reasonableness is instead analyzed based on the totality of the circumstances. *Id.* (citing *United States v. Drayton*, 536 U.S. 194 (2002)).

In this case, SA Iten testified he used the following Spanish phrase to ask Defendant for consent for the dog sniff: "Podemos utilizar un perro sentir tus maletas."[4] (Filing No. 56 at pp. 12, 14). Literally and directly translated, this phrase means: "We can use our dog to feel/sense your bags." There are two distinct issues with SA Iten's usage of this phrase to obtain Defendant's consent for a dog sniff. First, SA Iten, who also knows French and admittedly is a "limited Spanish speaker" and not "completely fluent" in Spanish, testified that he used the verb "sentir," which means "to smell" in French, not Spanish. Although "sentir" is also a Spanish verb, its primary meaning is understood to be for "tangential" touch. Second, according to Dr. Navarrete, a Spanish language expert, SA Iten did not use a rise in intonation at the end of this phrase, which means the phrase would be understood by a Spanish speaker to be a declarative statement, not a question.

In the context of SA Iten's interaction and conversation with Defendant, SA Iten's declarative statements about their dogs sensing/feeling bags would become even less clear to Defendant. In SA Iten's earlier conversation with Defendant, SA Iten explained "what we do at the station," why they were talking to him (Defendant's bathroom trips and travel itinerary), and asked Defendant if he had anything illegal on him. (Filing No. 39 at p. 91). SA Iten then asked Defendant for consent to search his bags using the phrase with a rise in intonation at the end, "Podemos buscar tus maletas," which

---

[4] The record suggests SA Iten may have instead stated, "podemos utilizar un perro para sentir olores," which translates to, "We can use a dog to sense smells." (Filing No. 56 at pp. 23, 53-54). However, SA Iten testified he did not use the word "oler" until after the sniff took place. (*Id.* at p. 20). If this is the phrase SA Iten used, it does not connect the idea that the dog would be "sensing smells" of bags, as "maleta" is not included in this phrase.

translates to the question, "May we search your bags?"  SA Iten testified Defendant did not give an affirmative response to the question, but instead "he asked me kind of why."  SA Iten testified he explained to Defendant again why they were talking to him: because he was "using the bathroom," he "seemed a little nervous," and because of the details of his trip.  SA Iten testified he then asked Defendant again for consent to search, but SA Iten understood Defendant to have not consented because "there was also just no kind of an equivocation, a -- a yes or a no answer."  Because Defendant was not clearly consenting to a search of his bags, and because Defendant's next bus had announced it was beginning to load passengers, SA Iten made the decision to "change gears to ask permission to have the dog sniff the bags."  It was on the heels of this conversation that SA Iten communicated to Defendant the declarative statement, "We can use our dog to feel/sense your bags," while touching his nose.  Defendant nodded his head in response to that statement.  But, was Defendant simply nodding his head to acknowledge SA Iten's statement that police "can use dogs" to sense/feel bags, or was Defendant affirmatively giving knowing consent for a dog to sniff his bags?  Based on the testimony received at the hearing, including Dr. Navarrete's expert testimony, and in reviewing Defendant's demeanor and expressions in Exhibit 1, the undersigned magistrate judge finds it was the former.

As Defendant points out, the officers involved were themselves not completely sure whether Defendant understood what was happening after he was led outside of the bus terminal after this purported consent.  Once investigators led Defendant outside with his bags, TFO Jaworski asked SA Iten, "Does he understand what's going on?"  SA Iten testified he then spoke to Defendant, stating, "me entiendes," followed by "y tu entiendes ah...tu comprendes que usar un perro," while pointing towards Defendant's bags.  Dr. Navarrete testified SA Iten *did* use an intonation at the end of the phrase, "me entiendes," which would translate to the question, "Do you understand me?"  Dr. Navarrete testified SA Iten did *not* use a rise in intonation at the end of the phrase, "y tu entiendes ah...tu comprendes que usar un perro," so that phrase would directly translate to the declarative statement, "We can use, we can utilize a dog," or "You understand, you comprehend that to use a dog."  (Filing No. 56 at pp. 54-55).  SA Iten testified he did not use the word "oler" (Spanish for "smell") or otherwise ask Defendant if he knew the dogs were coming to smell his bags.  SA Iten testified he only recalls that Defendant replied, "si."  SA Iten then relayed to TFO Jaworski, "He knows the dog is coming."  Nothing in SA Iten's discussion with Defendant clarified whether Defendant understood a dog was coming to *smell* his bags pursuant to Defendant's consent. Defendant was only asked if he understood they "can use dogs."  The continued concern regarding

Defendant's understanding was stated by TFO Jaworski himself in his update to TFO Bonney: "I don't know if he completely understands consent."

Adding to the issues with Defendant's purported consent were the facts that SA Iten did not tell Defendant in Spanish he was free to leave, that he was free to decline consent to a search of his luggage, or free to decline consent to the dog sniff, which are all relevant factors to take into account when assessing Defendant's consent. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("[K]nowledge of the right to refuse consent is one factor to be taken into account"). Here, SA Iten *asked* Defendant if they could search his bags, twice, and when he indicated they could not, SA Iten *told* Defendant "We can use dogs." Based on the expert testimony, SA Iten was communicating declarative statements to Defendant in Spanish, informing him "We can use dogs." Consent is not voluntary if it is "granted only in submission to a claim of lawful authority." *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973). SA Iten never clearly communicated a request to Defendant in Spanish asking for a dog to sniff his bags, and under these circumstances, it was unreasonable for task force officers to conclude that Defendant understood SA Iten's request for consent for the dog sniff and knowingly and voluntarily provided his consent. See *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) ("[T]he ultimate inquiry is not whether the defendant subjectively consented, but whether a reasonable officer would believe consent was given."). As such, the undersigned magistrate judge finds Defendant did not provide valid consent to the dog sniff of his bags.

## II.     Detention of Defendant and his Bags

The government took issue with the undersigned magistrate judge's finding that Defendant was detained during the dog sniff, and Chief Judge Rossiter requested additional analysis on this issue and the "seizure of Defendant's suitcase" as it pertains to Defendant's third and fourth objections.

"Police officers may briefly detain luggage for a dog-sniff search without violating the Fourth Amendment if the owner of the luggage consents . . . or if there is reasonable suspicion supported by articulable, objective facts that the luggage contains drugs." *United States v. Jones*, 990 F.2d 405, 407 (8th Cir. 1993); *United States v. Green*, 52 F.3d 194, 197-98 (8th Cir. 1995) ("In order for police officers to briefly detain luggage for a sniff search without violating the Fourth Amendment, they must have either the owner's consent or a reasonable suspicion supported by articulable objective facts that the luggage contains drugs."); see also *United States v. Place*, 462 U.S. 696, 706 (1983)

15

(concluding that officers must have reasonable suspicion "that a traveler is carrying luggage that contains narcotics" to seize that luggage and "briefly [ ] investigate the circumstances that aroused" their suspicion).

The government is correct that the seizure of the luggage and the seizure of Defendant are separate questions; however, the undersigned magistrate judge remains unconvinced that Defendant felt free to leave while his bags were in the custody of law enforcement for Loki's deployment. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In contrast, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

As the Supreme Court recognized in *Place*, the seizure of a traveler's luggage may also have the practical result of preventing an individual from leaving, therefore amounting to a seizure of their person as well. See *Place*, 462 U.S. at 708 (noting that seizure of luggage "can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return"). "At least when the authorities do not make it absolutely clear how they plan to reunite the suspect and his possessions at some future time and place, seizure of the object is tantamount to seizure of the person. This is because that person must either remain on the scene or else seemingly surrender his effects permanently to the police." *Id.* at n. 3 (quoting 3 W. LaFave, Search and Seizure § 9.6, p. 61 (1982 Supp.)).

Here, SA Iten testified he changed course to seek consent for a dog sniff of Defendant's bags because Defendant's bus had announced it was reboarding and Defendant was not consenting to a search. When TFO Jaworski was asked whether he allows a traveler to decide whether to reboard their bus and "continue on their way" or stay behind with their luggage after it has been seized, TFO Jaworski replied that he did not "think I personally have ever allowed the person to continue" to reboard their bus and travel to their destination. (*Id.* at p. 40). Defendant is not from Omaha and was only at the bus station because it was a required stop along his journey to his destination in North Carolina. Practically speaking then, it is difficult to say Defendant would feel "free to leave" at the time all his bags were out of his possession awaiting the dog sniff because the only place Defendant needed to go was his next bus to continue his journey—something TFO Jaworski indicated in his testimony he would not allow.

Regardless of whether Defendant was seized, however, the undersigned magistrate judge finds Defendant's luggage was in fact seized when law enforcement led him outside and directed him to place his bags out of his and the bus carrier's possession against the wall for the dog sniff. See *United States v. Va Lerie*, 424 F.3d 694, 706 (8th Cir. 2005) (en banc) (setting forth three factors to consider whether law enforcement's interference with luggage constitutes a seizure, including whether it delayed a passenger's travel or significantly impacted the passenger's freedom of movement; (2) whether it delayed the luggage's timely delivery; and (3) whether it deprived the carrier of custody of the item; satisfaction of any one factor constitutes a seizure). Having concluded Defendant did not validly consent to the dog sniff of his bag, task force officers therefore needed reasonable suspicion for the detention of Defendant's luggage to conduct the dog sniff. See *Jones*, 990 F.2d at 407. And, the undersigned magistrate judge remains unconvinced that reasonable suspicion existed to detain Defendant's luggage to conduct the dog sniff.

At the time Loki was deployed, the only facts investigators cited to support their suspicions of criminal activity were that Defendant went to the bathroom a couple of times during his layover and seemed nervous, he was from Mexico and had purchased a one way bus ticket for a cross-county trip from the west coast to stay with relatives in Raleigh for a few days to a week, and he had several elastics on his luggage. "When an officer can cite only one or two facts, including a generic claim of nervousness, as supporting his determination of reasonable suspicion, [a court] may conclude that his suspicion was not reasonable, for 'it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" *United States v. Onate*, No. 8:23CR3, 2023 WL 8015887, at *10 (D. Neb. Nov. 20, 2023) (quoting *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001)).

First, TFO Jaworski found it suspicious Defendant was traveling from California to North Carolina on a one-way ticket to stay with family for a few days to a week. TFO Jaworski did not elaborate upon the significance of this one-way ticket in his testimony, but one-way bus tickets are an oft-cited indication of suspicious activity at this particular bus station. See, e.g., *United States v. Clay*, No. 8:22-CR-140, 2023 WL 2047505, at *7 (D. Neb. Feb. 16, 2023); *United States v. Molina*, No. 8:18CR257, 2019 WL 1924904, at *3 (D. Neb. Mar. 6, 2019), report and recommendation adopted, No. 8:18CR257, 2019 WL 1924863 (D. Neb. Apr. 30, 2019). Defendant's travel itinerary may provide these experienced investigators with some suspicions of criminal activity, but such significance is relatively minor because it also describes a large number of innocent travelers. See *United States v. Beck*, 140 F.3d 1129, 1137-38 (8th Cir. 1998) ("Because millions of law-abiding

Americans reside in California and travel, mere residency in and travel from the State of California means the officer's 'source state' factor must be considered in this context. . . . Clearly, the vast number of individuals coming from that state must relegate this factor to a relatively insignificant role.").

Additionally, although "nervous, evasive behavior" can be a relevant consideration for reasonable suspicion, "courts are—for good reason—hesitant to give too much significance to officers' subjective evaluations of a suspect's purportedly nervous demeanor" because "[i]t is not uncommon for most individuals to 'exhibit signs of nervousness when confronted by a law enforcement officer.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) and *Beck*, 140 F.3d at 1139). "Thus, the Eighth Circuit has found the suspicion arising from supposedly 'nervous' behavior especially doubtful 'where the alleged signs of nervousness are not the kind of 'unusual,' 'exceptional,' or more objective manifestations of nervousness that might, in combination with' other largely ordinary factors, 'support a finding of reasonable suspicion.'" *Id.* (quoting *Jones*, 269 F.3d at 929). In reviewing the body camera footage, the undersigned magistrate judge does not view Defendant to be particularly nervous—at least, not more than an ordinary traveler confronted by the police. Defendant's nervousness is even less significant considering he is a Spanish speaker attempting to communicate with two English-speaking officers through a Google translation app and an admittedly non-fluent Spanish speaker.

TFO Jaworski also testified he took note of Defendant's restroom trips because officers have found drugs "dumped" inside the Omaha bus station restroom before. "The Court gives due consideration to Investigator [Jaworski's] experience in finding that travelers had, on prior occasions, dumped drugs in the bus-station restroom." *Onate*, 2023 WL 8015887, at *11. However, "it is not out of the ordinary for a traveler on a long bus trip to use the restroom during a brief break from the road," *id.* and it seems just as likely there could be innocent explanations for bathroom trips, such as encountering a line in the bathroom and returning later, or that Defendant had drank coffee on his early morning travel day and needed to go more than once. TFO Jaworski acknowledged Defendant's bathroom trips "could be an upset stomach,"—however, the record does not reflect he asked Defendant about his bathroom trips upon making contact.

Finally, TFO Jaworski testified he found it suspicious Defendant's suitcase had several luggage tag elastics, which suggests he has traveled more than once with that particular suitcase. TFO Jaworski recognized Defendant could simply be a "seasoned traveler." Observing that an individual has traveled several times with the same suitcase is so minor and applies to so many

innocent travelers such that this observation carries almost no weight in the reasonable suspicion consideration, particularly where again, TFO Jaworski did not ask Defendant about the elastics.

In sum, the factors cited by investigators—Defendant's travel itinerary, bathroom trips, more than one elastic luggage tag, and nervousness—even taken together, do not arise to reasonable suspicion. Therefore, the undersigned magistrate judge finds the government has failed to demonstrate the investigators had "reasonable suspicion supported by articulable objective facts" of drug possession to seize Defendant's bags. Without reasonable suspicion or valid consent, the seizure of Defendant's bags so that Loki could be deployed to sniff them violated the Fourth Amendment.

### III.    Loki's Reliability

Chief Judge Rossiter also referred the matter back for further discussion of Loki's reliability. In the undersigned magistrate judge's view, the discussion above renders further discussion of Loki's reliability moot; Loki's sniff of Defendant's bags was procured directly from a violation of Defendant's Fourth Amendment rights. Defendant's arrest and continued seizure of his suitcase pending application of the warrant is a product of that dog sniff, and, as outlined above, investigators lacked consent or reasonable suspicion to detain Defendant's luggage for the dog sniff. Without the dog sniff resulting in an alert to Defendant's suitcase and indication to his backpack, investigators had no reason to continue to detain his bags to procure the warrant. Nevertheless, the undersigned magistrate judge will elaborate upon Loki's reliability as instructed, and again finds Defendant has not overcome the presumption that Loki, a trained and certified drug dog, was reliable under the circumstances presented.

The Eighth Circuit has repeatedly and consistently held that "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Rederick*, 65 F.4th 961, 967-68 (8th Cir. 2023) (quoting *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010) and citing *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) (concluding that "the positive alert by a reliable dog alone established probable cause")). "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *United States v. Perez*, 29 F.4th 975, 986 (8th Cir. 2022), *reh'g*

*denied*, No. 21-1191, 2022 WL 1609225 (8th Cir. May 20, 2022) (quoting *Florida v. Harris*, 568 U.S. 237, 246-47 (2013)). "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Id.* (quoting *United States v. Gonzalez*, 781 F.3d 422, 429 (8th Cir. 2015).

The Eighth Circuit recently reaffirmed the framework for determining whether a drug dog sniff is reliable enough to establish probable cause:

> [T]he framework courts should use to determine whether a drug dog sniff is reliable enough to give police officers probable cause to conduct a search . . . is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."

*Perez*, 29 F.4th at 986 (quoting *United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014)). "The positive alert by a reliable dog alone established probable cause." *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016). A search warrant affidavit "need only state the dog has been trained and certified to detect drugs" and "need not give a detailed account of the dog's track record or education." *Id.* (quoting *United States v. Lakoskey*, 462 F.3d 965, 978 (8th Cir. 2006)).

Deputy Woodward testified he has been a canine handler for 12 years, and has been with Loki for seven years. Deputy Woodward testified Loki is certified as a narcotics indicating canine, which includes marijuana, methamphetamine, heroin, and cocaine, but not fentanyl. Deputy Woodward and Loki train for drug detection every week for a four-hour block, and received their annual recertification on April 25, 2022. (Ex. 9, 12). Defendant did not provide an expert witness or otherwise adduce testimony demonstrating Loki's certification or training program were inadequate. See *Perez*, 29 F.4th at 986 (presumption of reliability "may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program[.]"); *United States v. Tuton*, 893 F.3d 562, 570 (8th Cir. 2018) ("[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert.").

Defendant points to Loki's field record to demonstrate Loki is unreliable. Loki's deployment records reflect that, including the instant deployment, Loki was deployed 21 times in the prior year. Of these deployments, Loki indicated 15 times. Fourteen of those had a known result where the bags were searched; of those searches, nine resulted in recovery of contraband; one had an unknown result because it did not make it into the report; and five resulted in no contraband being found. These

records reflect an in-field accuracy of somewhere between 60 to 64 percent.  In *Perez*, the Eighth Circuit rejected the defendant's assertion a drug canine's sniff was unreliable because she has previously falsely indicated the presence of drugs during training, as the canine's degree of accuracy was higher than the accuracy rates of other drug-sniffing dogs which have been deemed reliable.  29 F.4th at 986 (citing *Holleman*, 743 F.3d at 1157 (finding drug canine reliable despite a 57 percent "in-field" accuracy considering the canine and canine handler's annual recertification) and *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (concluding canine was reliable when considering his training and certification, despite his in-field accuracy of 54 percent)).  The Eighth Circuit has suggested in-field accuracy exceeding fifty percent is the benchmark of reliability for a trained and properly certified canine.  See *Donnelly*, 475 F.3d at 955.  Additionally, Loki's field records are also less important than his training records, as courts have indicated more emphasis should be placed on a dog's performance in controlled training settings than its track record in the field.  See *Harris*, 568 U.S. at 237.

Defendant also has not demonstrated Loki's deployment was conducted in an inappropriate or unreliable manner.  Defendant's three bags were set apart from each other outside the bus terminal, away from other confounding variables and luggage.  Deputy Woodward testified he deployed Loki from the north to the south in order to "get Loki's nose into . . . the wind."  Deputy Woodward testified Loki alerted to the suitcase and gave an alert and indication to the backpack.  Deputy Woodward testified an alert is "an untrained behavior when the dog is in an odor of a narcotic."  Deputy Woodward testified that Loki alerts by "becom[ing] nasally" and his "tail will start wagging, and you'll see him working in the area of where the odor is emanating from."  Deputy Woodward testified an indication is "the final behavior when the dog is in an odor of one of the four odors that it is trained on."  Deputy Woodward testified Loki's indication is to "take a deep breath" and either stand and stare, sit down and stare, or lay down and stare because he is a passive-indicating dog.  Deputy Woodward testified there cannot be an indication without an alert, and an alert always precedes an indication.  Although TFO Bonney suggested to Deputy Woodward to try a second deployment inside so that the wind was not a factor, Deputy Woodward, the experienced and certified canine handler, testified he was "fine with the way the deployment went."  Defendant has not explained why the particular circumstances surrounding Loki's deployment on this occasion cause concern for his alert and indication.  Deputy Woodward and Loki were trained and recertified in drug detection, and although Loki's in-field performance is not stellar, it rises above the threshold for reliability as outlined by the Eighth Circuit.

## IV.    Search Warrant and *Leon* Good Faith

It is important to recall the evidence Defendant seeks to suppress—fentanyl found in his suitcase—is a result of the execution of a search warrant.  Officers did not perform a warrantless search of Defendant's suitcase to recover the evidence in this case.  So, although Chief Judge Rossiter did not explicitly refer the matter back regarding the warrant and *Leon* good faith exception, the discussion and supplemental findings above requires the undersigned magistrate judge to revisit that analysis.

"If an affidavit in support of a warrant contains information that was obtained in violation of the Fourth Amendment, the reviewing court must redact that information and evaluate whether the remainder establishes probable cause." *United States v. Brooks*, 22 F.4th 773, 778-79 (8th Cir.), *cert. denied*, 142 S. Ct. 2826 (2022) (citing *United States v. Karo*, 468 U.S. 705, 719 (1984) and *United States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008)).  Here, if the information obtained in violation of Defendant's Fourth Amendment rights was redacted from the warrant affidavit—Loki's indication to Defendant's backpack and alert to Defendant's suitcase, and events that transpired as a direct product of the unlawful dog sniff—the warrant affidavit does not establish probable cause.  As discussed above, Defendant's trip details, bathroom trips, and perceived nervousness do not amount to reasonable suspicion, let alone probable cause.

Under *Leon*, evidence seized in reliance on a search warrant is not subject to suppression unless:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702-03 (8th Cir. 2017) (citing *Leon*, 468 U.S. at 923).  For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, officers' pre-warrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." If "the officers' pre-warrant conduct is 'clearly illegal,' the good-faith exception does not apply." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). "The 'operative test' is 'whether a reasonably well trained officer

22

would have known that the search was illegal [despite the issuing judge's authorization].'" *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021), *reh'g denied* (May 19, 2021) (quoting *United States v. Koch*, 625 F.3d 470, 477 (8th Cir. 2010)).

Having the benefit of supplemental testimony and after reconsideration of the evidence, the undersigned magistrate judge finds investigators' pre-warrant conduct was not "close enough to the line of validity" to make their belief in the warrant's validity objectively reasonable. See *United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016). SA Iten, who admittedly is a "limited Spanish speaker" and not "completely fluent" in Spanish, never actually communicated a request to Defendant in Spanish asking for consent to the dog sniff his bags. SA Iten only told Defendant "we can use dogs," "we can use dogs to sense smells," or "we can use dogs to sense/feel bags." The record reflects the investigators involved were not even sure whether Defendant understood what was happening, and SA Iten's attempts to clarify Defendant's comprehension only verified Defendant "knows a dog is coming," resulting in TFO Jaworski's observation that, "I don't know if he completely understands consent." Under the circumstances, the investigators' conduct was "clearly illegal," such that their belief Defendant comprehended the request and validly consented to the dog sniff of his bags was not objectively reasonable. Because the warrant application's probable cause is completely reliant on the results of a dog sniff that was obtained in clear violation of Defendant's Fourth Amendment rights, the *Leon* good faith exception does not apply. Upon consideration,

**IT IS HEREBY RECOMMENDED** to Robert F. Rossiter, Jr., Chief United States District Court Judge, that the Findings and Recommendation (Filing No. 40) be amended, and that Defendant's Motion to Suppress Evidence and Request for Evidentiary Hearing(s) for the Motion to Suppress and under *Franks v. Delaware* (Filing No. 18) should be granted as set forth above.

Dated this 22nd day of December, 2023.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

23

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Supplemental Findings and Amended Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Supplemental Findings and Amended Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.